IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **GISSELLE BRIOSO MATOS, in her personal and capacity and in representation of her minor child, F.L.M.B.;**<br><br>Plaintiff,<br><br>v.<br><br>**AMERICA CRUISE FERRIES, INC.; BAJA FERRIES USA; BAJA FERRIES S.A. de C.V.; STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD; THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA); THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED;**<br><br>Defendants. | CIVIL NO. 16-2614<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

**TO THE HONORABLE COURT:**

NOW COMES the Plaintiff, **Gisselle Brioso Matos, in her personal and capacity and in representation of her minor child, F.L.M.B.;** through the undersigned attorneys and respectfully alleges and prays as follows:

### I. INTRODUCTION

1. This is a federal question action filed by plaintiff to redress her injuries suffered due to the intentional and/or negligent acts committed by

defendants, related to a chain of negligent acts occurred between August 16 and August 17, 2016.

## II.    JURISDICTION AND VENUE

2.    This Court has Admiralty and Maritime Jurisdiction and the claim in within the meaning of Fed. R. Civ. P.9 (h). Admiralty and Maritime Jurisdiction is based upon 28 U.S.C. §1331 and 28 USC §1333.

3.    Moreover, the jurisdiction in this case is also founded pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff, **GISSELLE BRIOSO MATOS, in her personal and capacity and in representation of her minor child, F.L.M.B.;** and Defendant, a corporation registered and with place of business in Puerto Rico. Furthermore, the amount in controversy in the Complaint exclusive of interests and costs exceeds seventy five thousand dollars ($75,000.00).

4.    Venue of this action in this district is proper pursuant to 28 U.S.C. Sec. 1391 (b), since the incident occurred on the navigable waters of the United States in connection with traditional maritime activity such as ferrying passengers from the Dominican Republic to Puerto Rico aboard the M/V Caribbean Fantasy and/or since defendant consented to be sued in PR Federal Court pursuant to Admiralty and Maritime law.

## III.    REQUEST FOR JURY TRIAL

5.    Plaintiff requests trial by jury.

## IV.   PARTIES

6.   Plaintiff**, GISSELLE BRIOSO MATOS, in her personal and capacity and in representation of her minor child, F.L.M.B.;** of legal age, single, with the following address: Felipe Vicini Perdomo 35 Villa Consuelo, Santo Domingo, Dominican Republic. **F.L.M.B** was born on October 30, 2002 and lives with her mother in the Dominican Republic (herein "The Minor").

7.   Defendant **AMERICA CRUISE FERRIES**, **INC.** (herein "ACF") is a corporation duly registered and authorized by the state of Puerto Rico with principal offices in Concordia 249, Mayaguez, PR 00680. Their Resident Agent is: Néstor González García, located at Concordia 249, Mayaguez, PR 00680.

8.   Defendant **BAJA FERRIES USA** (herein "BAJA FERRIES") is a corporation duly registered and authorized by the state of Miami, Florida with principal offices in 2601 S Bayshore Dr # 1110, Miami, FL 33133, USA.

9.   Defendant **BAJA FERRIES S.A. de C.V.** (herein "BAJA FERRIES") is a corporation duly registered and authorized in Mexico, with the following location: Ignacio Allende 1025, Zona Central, 23000 La Paz, B.C.S., Mexico.

10.   Codefendant **STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which

3

would cover liabilities and personal injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Steamship Mutual Management (Bermuda) Ltd address is as follows "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

11.    Codefendant **THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA)**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Said codefendant's address is as follows "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

12.    Codefendant **THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal

4

injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Said codefendant's address is as follows "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

### V.   STATEMENT OF CLAIM

**a. Information regarding M/V Caribbean Fantasy (herein "The Ferry")**

13.   At all relevant times ACF managed the vessel known as **M/V CARIBBEAN FANTASY**.

14.   At all relevant times ACF operated the vessel known as **M/V CARIBBEAN FANTASY**.

15.   At all relevant times ACF lease the vessel known as **M/V CARIBBEAN FANTASY**.

16.   At all relevant times BAJA FERRIES owned the vessel known as **M/V CARIBBEAN FANTASY**.

17.   At all relevant times BAJA FERRIES provides maintenance to the vessel known as **M/V CARIBBEAN FANTASY**.

**b. The incidents**

18.   On June 27, 2016, Plaintiff bought the ticket for the voyage departing on August 16, 2016 from Santo Domingo, Dominican Republic, to Puerto Rico.

19.   The Minor is blind.

20.   Plaintiff paid the total amount of $330,96. Plaintiff also paid the total sum of $68.00 for the cabin with four beds.

21.    The voyage was supposed to be a roundtrip leaving on August 16, 2016 and returning on August 24, 2016.

22.    The Ferry carried approximately 512 passengers/crewmembers.

23.    Plaintiff checked in on August 16, 2016, at 4.54 pm, and at between 7pm-8pm the Ferry departed.

24.    Once Plaintiff checked in, she paid $10 for her room key which would be reimbursed once Plaintiff returned that key.

25.    Due to the events herein described Plaintiff could not return the key and defendants kept Plaintiff's deposit.

26.    Although Plaintiff was happy to travel to PR her happiness was destroyed when she started noticing the Ferry's defects.

27.    Plaintiffs left their luggage at their stateroom.

28.    Plaintiffs' stateroom was located at deck 6.

29.    At approximately 8pm, Plaintiffs were at deck 7 (bow) and watched that the Ferry tried to depart but were not able to do so. After approximately 45 minutes, The Ferry departed.

30.    While on the Ferry, Plaintiffs were not able to walk easily through the Ferry once departed, since the Ferry was shaking and Plaintiff had to grab his son with one hand and with the other grab walls or handles.

31.    Since the air conditioning was not working well, she started sweating and could not sleep well.

32.    On August 16, 2016, Plaintiff complained two times with defendants that the air conditioner was not working.

6

33.     Due to the high temperatures at the stateroom, Plaintiffs was not able to sleep.

34.     Plaintiffs noted there was no good air circulation on the common areas.

35.     No fan was provided by defendants even though Plaintiff complained.

36.     Before leaving the stateroom, Plaintiff took a shower and was extremely cold and the hot water was not working.

37.     At approximately 6.30am, Plaintiffs went to have breakfast.

38.     At approximately 7am, two passengers informed Plaintiffs that the Ferry started burning and Plaintiffs noticed heavy smoke.

39.     Plaintiffs were instructed to go to the bow.

40.     While at the bow, she saw a chaotic scene, since people were hysterical, screaming, pushing each other and shouting.

41.     Plaintiffs do not know how swim.

42.     While waiting at the bow, Plaintiff started inhaling smoke generating from the fire onboard the Ferry.

43.     Due to the fire, the Ferry's crewmembers instructed Plaintiff to evacuate the Ferry.

44.     Crewmembers stated that the first ones that will board the life rafts were minors, mothers and elders.

45.     After struggling, pushing and yelling to Plaintiffs that tried to access the life raft, they finally boarded the life raft.

46.    Plaintiffs waited approximately one hour for the life raft to be lowered to the ocean since the life raft got stuck.

47.    While descending to the water, once again it got stuck the raft boat, and it started hitting the Ferry.

48.    Plaintiffs had a feeling that the life raft would break in any time.

49.    The passengers aboard the life raft were desperate and it almost tip over the raft boat.

50.    No seat belt was available at the raft boat.

51.    At the life raft there was nowhere to hang on and the Minor had to be on Plaintiff's legs, graving him, with nowhere to hang.

52.    Thus while onboard the raft boat she had the feeling that she could fall to the ocean anytime.

53.    The raft boat was not prepared for this emergency.

54.    The Minor vomited several times and Plaintiff was feeling extremely nauseous.

55.    Once the raft boat reached the Ocean, it was already broke and water started began accessing the life raft.

56.    Despite being on the ocean, the life raft continue striking with the Ferry since no effort was made to get away the ferry.

57.    Passengers (including Plaintiff) onboard the life raft helped taking water off the life raft.

58.    The Minor was screaming, crying and in deep pain.

59.    Plaintiff started constantly vomiting.

8

60.     Approximately after one hour and a half of thinking that the life raft will sink any moment, finally the USCG arrived.

61.     At that moment, an individual went overboard and into the ocean.

62.     Plaintiffs waited approximately 45 minutes while the USCG tied their vessel to the life raft.

63.     The Minor was transferred to the USCG's vessel

64.     Once the Minor was onboard the USCG's vessel, Plaintiff had to wait until they transfer other passenger.

65.     During those endless minutes, the Minor could not see what was happening and Plaintiff saw how desperate was the Minor.

66.     After several minutes, Plaintiff was transferred to the USCG's vessel.

67.     At the pier, the Minor received basic life support, they took the Minor's blood pressure, provide him with oxygen mask, and also provided him something to stop from vomiting.[1]

68.     After that, they were instructed to lay in a canvas.

69.     Then, Plaintiffs were taken to the Panamerican Pier and then they did customs.

70.     Plaintiffs left approximately at 1pm to Plaintiff's sister house.

71.     At that house, her sister gave the Minor a medication to prevent vomiting.

72.     During that night a rash was all over Plaintiff's body.

---

[1] Since Plaintiff was dazed, she was not able to understand what was giving to the Minor.

73.   On August 26, 2016, Plaintiffs took a plane to the Dominican Republic.

74.   Before, during and after the flight, the Minor vomited.

75.   The Minor begged not to fly.

76.   Since August 17, 2016, the Minor cannot sleep alone.

77.   Plaintiffs had high blood pressure, nausea, dizzy, dehydrated, with stomach, chest and head ache and with constant crying spells, among others.

78.   As a result of this incident, Plaintiffs assured that they will never travel again on a ferry/cruise.

79.   Such injuries occurred as a proximate result of the unsafe, negligent and unseaworthy condition of the vessel operated by Defendants.

### FIRST CAUSE OF ACTION – NEGLIGENCE

80.   The allegations contained all in previous paragraphs are re-alleged as if fully alleged herein.

81.   The Ferry was built in 1989 in Japan, and is Baja Ferries property.

82.   The Ferry's flag is from Panamá.

83.   The Ferry do commercial activities between Dominican Republic and Puerto Rico such as ferrying passengers.

84.   Between 2011 and 2015, the US Coast Guard found at least 107 security deficiencies, which most of the them (approximately 44) were related to the fire system.

85.     Some of those deficiencies were related to the incorrect operating of the fire screen doors, which usually were not able to be close and/or were reported as open when they were close.

86.     On an October 16, 2014, Inspection made by the USCG stated that the "inflatable liferafts used in conjunction with MES shall comply with the requirements of Section 4-2. The liferafts 4, 13,17,18 &24 were found with the painter lines falling off the liferaft line storage pockets".

87.     A January 2015 inspection made by the United States Coast Guard ("herein "USCG") stated that oil fuel lines should be screened or protected in some way to avoid any pray or leakage onto ignition sources.

88.     Specifically in April 17, 2015, the USCG stated that the "fire screen doors shall be capable of closing at an angle of inclination of up to 3.5 degrees. The following double leaf doors were found out of sequencing and prevents the doors from closing" and that "all waste receptables shall be constructed of non combustible materials. Waste receptacles located on upper deck (open) were found to be plastic".

89.     During the past 36 months, USCG's inspections of the Ferries had led to detentions.

90.     In October, 2015, the Ferry was detained in San Juan for three days by the U.S. Coast Guard for three deficiencies related: fire safety measures (international shore connection); crew certificates (certificates of competency) and ship's certificates and documents (safety manning document).

11

91.    Other warnings provided by the US Coast Guard were that the fire extinguishers were not working well.

92.    The US Coast Guard found deficiencies on the ceiling sprinklers that stop the flames.

93.    Between March and July 2016, the Ferry underwent maintenance work at Europe.

94.    Even though defendants informed the public that they would start operating on July 1, 2016, they were unable to provide ferrying service to passengers since the Ferry was still in Europe receiving maintenance.

95.    In July 2016, while refueling the Ferry at Port of Gibraltar, prior to continuing across the Atlantic to Puerto Rico, the Ferry was detained for six days and related to deficiencies related to the auxiliary engines.

96.    After the alleged repairs at the Port of Gibraltar, the Ferry continued its voyage to Puerto Rico.

97.    While in their voyage, the Ferry's engines failed.

98.    The ferry was unable to continue their voyage for approximately a day.

99.    Due to said mechanical failure, the Ferry changed its voyage and travel to Santo Domingo, Dominican Republic.

100.    At the Santo Domingo's Port, the Ferry allegedly repaired the engine.

101.    Early August, 2016, the Ferry arrived at the Port of San Juan, Puerto Rico.

102.  During the USCG inspection, they determined that one of three life rafts were working.

103.  A USCG inspection early August 2016, found four deficiencies related to fire safety measures and one related to the propulsion and auxiliary machinery.

104.  During August 17, 2016's emergency, the Ferry's life rafts and sliding were not working properly and/or were not properly installed.

105.  Two of the three life rafts were not working well.

106.  One life raft got stuck while descending.

107.  The second life raft, got stuck while descending to the ocean and when it reached the ocean its engines failed.

108.  This second life raft, was rescued by other vessel and/or vessels.

109.  During the voyage from Santo Domingo to San Juan, and while Plaintiff was onboard the Ferry, the air conditioner was not working well and/or was not working at all.

110.  Such was an indication of mechanical and/or electrical failure.

111.  Due to information and/or belief the Fire started at 7.15 am at the machinery room.

112.  The Fire at the Ferry started when the Ferry was near the Thermoelectric in Levittown, PR.

113. Defendants lack of repair and/or failure to provide proper maintenance to the Ferry and/or failure to properly and immediately repair the

13

deficiencies informed by the USCG on their report dated August 17, 2016, among others, provoked the fire inside the Ferry.

114. Plaintiff's damages were a direct consequence of defendants' negligence by:  (i) failing to provide a safe ferry; (ii) failing to protect the passengers; (iii) failing to maintain safe premises; (d) failing to provide adequate emergency instructions; (iv) by failing to hire adequate personnel which were not well trained and/or had lack of knowledge on emergency proceedings and/or had lack of knowledge on descending life rafts; (v) by failing to repair and/or properly repair the engine, electric and/or propulsion defects; (vi) Defendants knew or should have known of the Ferry's mechanical, electrical and/or propulsion defects and did not repair it and/or failed to properly repair them; (vii)  Defendants' breached their duty of care to Plaintiff to the extent they failed to properly maintain properly working the life rafts and other safety equipment; (viii)  defendant provoked Plaintiff unnecessary delay in the evacuation of the Ferry; (ix) failed to cancel the voyage despite knowing that the vessel was not properly working; (x) the Ferry was operated knowing was unseaworthy due to the defective engines, life rafts, electricity, air conditioners, emergency equipment and procedures.

115. Due to the abovementioned, defendants failed to comply with the general maritime and admiralty law of the United States and with the Art. 1802 and 1803 of the PR Civil Code.

116. Defendants actions and omissions, through fault and/or negligence, caused damages to Plaintiff, in violation of Art. 1802 and 1803 of

14

the PR Civil Code and General Maritime Law entitling plaintiff to damages caused as a result of those acts and omissions.

117.   Defendants are jointly liable against Plaintiff.

118.   Defendants' negligence and/or intentional acts were a proximate legal cause of Plaintiff's injury.

119.   On the other hand, as previously mentioned, on July 29, 2016, Plaintiff bought the tickets for the voyage departing on August 16, 2016 from Santo Domingo, Dominican Republic, to Puerto Rico.

120.   Plaintiff paid the total amount of $398.96, plus the sum of $10 that the ferry would pay if Plaintiff had returned the key.

121.   In view that Plaintiff were unable to enjoy the Ferry and the Ferry was unable to reach the Port that was hired, then Defendants shall reimburse Plaintiff the total amount of $408.96 and also be compensated for the total amount of $1,000.00 due to the fact that when the ferry returned the luggage, the clothe inside the luggage was damaged.

122.   Also, Plaintiff requests the total sum of $1,377.06, which was the amount that she spent while in Puerto Rico without her luggage.

**SECOND CAUSE OF ACTION – UNSEAWORTHINESS**

123.   The allegations contained all in previous paragraphs are realleged as if fully alleged herein.

124.   Defendants maintained an unsafe place for plaintiff and exposed them to danger while ferrying passengers with a Ferry with serious engine,

electricity and propulsion defects and also with the life rafts, mechanical and technical defects, and with lack of maintenance to the Ferry, as abovementioned.

125. The vessel was unseaworthy and defendants' failed to repair the dangerous situation.

126. Plaintiff's injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, which was managed, operated and/or maintained by defendants. In addition, said injuries were caused in whole, as a proximate result of negligence on the part of the Defendants, its agents, servants and/or employees.

### THIRD CAUSE OF ACTION – CLAIM AGAINST THE INSURANCE

127. The foregoing paragraphs are realleged and reasserted herein.

128. Co-defendants **STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD; THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED; STEAMPSHIP INSURANCE MANAGEMENT SERVICES LTD;** is liable for the negligence, fault, legal violations and unseaworthy conditions of their insured up to the coverage limit of the certificate of entry to their benefit. Plaintiff hereby exercises their right to present a direct action against the aforementioned protection and indemnity club.

### DAMAGES

129. As a result thereof, Plaintiffs suffered and continue suffering: Plaintiff Brioso received trauma to his arm, post traumatic stress disorder, unable to get close to the ocean, muscle pain, dizziness, nausea, psychiatric and psychological damages, extreme panic, sadness, anxiety during the ordeal,

16

vomit, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, depression, her tranquility has been seriously affected, suffered economic losses, all of which affects her daily activities.

130.   As a result thereof, The Minor suffered and continue suffering: post traumatic stress disorder, unable to get close to the ocean, muscle pain, dizziness, nausea, psychiatric and psychological damages, extreme panic, sadness, anxiety during the ordeal, vomit, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, depression, her tranquility has been seriously affected, suffered economic losses, all of which affects her daily activities. Not seeing nothing made all those hours a big nightmare that he can still can get out.

131.   Plaintiff damages herein alleged apply to all causes of actions.

132.   As a result of the events described herein, Plaintiff has suffered and continues to suffer irreparable physical, economical and emotional damages.

## VI. RELIEF

133.   Wherefore, Plaintiffs prays that this court enter judgment in favor of plaintiff and against defendants and award the Plaintiffs the following monetary amounts, totaling $2,201,377.06 to be paid by defendants:

    a.      for Plaintiff Gisselle Brioso's emotional and physical damages  and her pain and suffering an amount in excess of $1,000,000.00.

b.      for Plaintiff F.L.M.B. emotional and physical damages and his pain and suffering an amount in excess of $1,000,000.00.

c.      Punitive damages for an amount not less than $200,000.00.

d.      For Economic Damages, an amount not less than $1,377.06.

e.      Provide for the payment of all applicable interests, including prejudgment interest, together with reasonable attorney's fees, litigation expenses and the costs of this action.

f.      Grant plaintiff such other and further relief as the Court may deem appropriate and proper and retain jurisdiction over this action in order to assure full compliance with any decree issued by this court.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 9th day of September, 2016.

> **BELLVER ESPINOSA LAW FIRM**
> Condominio El Centro I, Suite 801
> 500 Muñoz Rivera Avenue
> San Juan, Puerto Rico 00918
> Tel(787) 946-5268/Fax(787)946-0062
>
> S/Alejandro Bellver Espinosa
> Alejandro Bellver Espinosa, Esq.
> U.S.D.C. – P.R. 225708
> Email: alejandro@bellverlaw.com
>
> /s/ Krystal Santiago Sánchez
> Krystal Santiago Sánchez, Esq.
> U.S.D.C. – PR 303611
> Email: krystal@bellverlaw.com

18